IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TEAM KENNEDY, | ) |
| Plaintiff, | ) |
| and | ) |
| GREEN PARTY OF NEW YORK, LIBERTARIAN PARTY OF NEW YORK, DR. JILL STEIN, GLORIA MATTERA, HOWIE HAWKINS, CRYSTAL SHARADIN, MARGARET WALTON, ANDREW KOLSTEE, MARK BRAIMAN and RICHARD PURTELL, | ) |
| Plaintiff-Intervenors, | ) |
| -against- | ) |
| HENRY T. BERGER, in his official capacity as the Co-Chair of the New York State Board of Elections; PETER S. KOSINSKI, in his official capacity as the Co-Chair of the New York State Board of Elections; ESSMA BAGNUOLA, in her Official capacity as a Commissioner of the New York State Board of Elections; ANTHONY J. CASSALE, in his official capacity as a Commissioner of the New York State Board of Elections; KRISTEN ZEBROWSKI STAVISKY, in her official capacity as Co-Executive Director of the New York State Board of Elections; RAYMOND J. RILEY, III, in his official Capacity as Co-Executive Director of the New York State Board of Elections; and, LETITIA JAMES, in her official capacity as the Attorney General of the State of New York, | ) No. 1:24-cv-03897-ALC |
| Defendants. | ) |

**PLAINTIFF-INTERVENORS' COMPLAINT IN INTERVENTION
AND FOR DECLARATORY AND INJUNCTIVE RELIEF**

# INTRODUCTION

1. This Complaint is brought by Green Party of New York ("GPNY") and Libertarian Party of New York ("LPNY"), two political parties that seek to qualify for the ballot in the state of New York, together with Dr. Jill Stein, Gloria Mattera, Howie Hawkins, Crystal Sharadin, Margaret Walton, Andrew Kolstee, Mark Braiman and Richard Purtell, who are voters and candidates who seek to associate with, hear from, and support GPNY or LPNY (collectively, "Plaintiff-Intervenors"). Plaintiff-Intervenors intervene in this action to join in Plaintiff Team Kennedy's challenge to the constitutionality of certain provisions of the New York Election Law[1], and to assert related but distinct claims for the violation of their rights guaranteed by the First and Fourteenth Amendments. Plaintiff-Intervenors seek declaratory relief and permanent injunctive relief.

2. Team Kennedy initiated this action to challenge the following provisions: (1) Section 6-140(1)(b), which prohibits petition circulators or witnesses from signing the "Statement of a Witness" if they sign a nominating petition as a voter for another candidate for the same office; (2) Section 6-130, which prohibits petition signers from recording their village instead of their city or town; (3) the requirement that Independent presidential candidates name their slate of presidential electors on their nominating petition, when partisan candidates are not required to name theirs until after the national nominating conventions; (4) Section 6-142, which requires Independent presidential candidates to collect a minimum of 45,000 valid signatures on nominating petitions within just six weeks, as applied in combination with Section 6-154, which requires such candidates to bear the cost of the verification of nominating petition signatures based

---

[1] N.Y. Elec. Law § 1-100 *et. seq.* All statutory citations herein are to the New York Election Law unless otherwise indicated.

on a private petition challenge process; and (5) Section 17-122(4), which prohibits payment of petition circulators and witnesses on a per signature basis. Complaint (ECF No. 10) ("Compl."), at 3-5.

3. Plaintiff-Intervenors adopt and incorporate by reference each and every paragraph contained within Team Kennedy's complaint.

4. Additionally, Plaintiff-Intervenors assert claims against the following provisions: (1) Section 6-138(4) ("A signature made earlier than six weeks prior to the last day to file independent petitions shall not be counted"); (2) Section 6-158(9) ("A petition for an independent nomination for an office to be filled at the time of a general election shall be filed not earlier than twenty-four weeks and not later than twenty-three weeks preceding such election"); (3) Section 6-142(1) ("An independent nominating petition for candidates to be voted for by all the voters of the state must be signed by at least forty-five thousand voters, or one percent of the total number of votes, excluding blank and void ballots, cast for the office of governor at the last gubernatorial election, whichever is less, of whom at least five hundred, or one percent of enrolled voters, whichever is less, shall reside in each of one-half of the congressional districts of the State"); (4) Section 6-140 ("[E]ach sheet of an independent nominating petition shall be signed in ink…"); and Section 1-104(3) (defining "party" as a political organization that "received at least two percent of the total votes cast … or one hundred thirty thousand votes, whichever is greater," for its candidate for governor and for its candidate for president).

5. As applied in 2024, Section 6-138(4) prohibited Plaintiff-Intervenors from circulating nominating petitions to qualify for New York's general election ballot prior to April 16, 2024. This categorical ban against core First Amendment protected conduct cannot be justified by any state interest. Further, as applied in combination with Section 6-158(9), which establishes one

of the earliest filing deadlines in the nation, Section 6-138(4) establishes one of the shortest petition circulation periods in the nation – just 43 days in 2024. This needlessly short petitioning period drastically increases the burden of complying with the 45,000-signature requirement imposed by Section 6-142(1), which is itself one of the highest in the nation. Taken together, the foregoing provisions require those seeking to qualify for the ballot in New York to collect more signatures per day than any other state in the nation except Texas. In 2024, Plaintiff-Intervenors were required to obtain 1,047 valid signatures per day for each day of the 43-day petitioning period. No other state except Texas requires so many signatures in such a short time.

6. New York's ballot access requirements were not always so onerous. From 1992 until 2018, New York required 15,000 signatures for statewide office, including 100 signatures from half of New York's 26 Congressional Districts. These requirements were more than sufficient to protect New York's legitimate regulatory interests; it did not have a history of overcrowded ballots or any other problems associated with its ballot. New York nonetheless tripled its signature requirement to 45,000 and increased its distribution requirement to 500 signatures from half of New York's 26 Congressional Districts, starting in 2020, but failed to extend its petitioning period. This spike in the number of signatures required and in the distribution requirement, which must be satisfied in the same short period of time, is what now makes New York's requirements so unduly restrictive.

7. The difficulty of complying with New York's burdensome requirements is exacerbated by Section 6-140, which mandates the same inefficient, laborious and archaic petitioning procedure that New York adopted 134 years ago when it first began regulating access to the ballot – *i.e.*, gathering signatures by hand on paper nomination petitions. This procedure is inherently time-consuming and resource-intensive. It may have been adequate in 1890, when New

York only required 1,000 signatures, but it is now grossly inadequate as a method of demonstrating the requisite voter support. For example, to ensure compliance with the already-excessive 45,000-signature requirement, one must exceed it by approximately 50 percent to account for the substantial number of signatures that are invalidated due to illegibility, missing or incorrect information or other technical defects. And to ensure compliance with the signature distribution requirement, each petition signer's voter registration must be looked up to confirm his or her Congressional District – and signatures must be collected until that requirement is satisfied. Section 6-140's inherent inefficiencies thus compound the burden and expense of complying with New York's ballot access requirements.

8. The cost of conducting a successful statewide petition drive in New York is staggering. In 2022, LPNY spent nearly $300,000 on its petition drive and the effort still fell short. In 2024, GPNY and Dr. Stein's campaign committee Jill Stein for President 2024 ("JSFP") spent approximately $368,000 on their petition drive but that effort also fell short. Team Kennedy's 2024 petition drive – the only one to succeed under New York's current requirements – cost $1.1 million. The provisions challenged herein thus operate as a near-absolute barrier to non-wealthy candidates and parties who seek to participate in New York's electoral process but cannot afford the exorbitant cost, including Plaintiff-Intervenors.

9. Furthermore, from 1936 until 2020, a party could retain ballot status in New York by polling 50,000 votes for governor every four years. Pursuant to Section 1-104(3), however, parties now must poll 130,000 votes or 2% of the vote (whichever is greater) for governor and president every two years – a drastic increase in that is wholly unnecessary to serve any legitimate state interest.

5

10. Plaintiff-Intervenors assert claims for the violation of their rights to cast their votes effectively, to speak, receive information, and associate for political purposes, and to the equal protection of law, as guaranteed by the First and Fourteenth Amendments. They respectfully request that the Court declare the challenged provisions unconstitutional separately and as applied in combination with one another, and permanently enjoin Defendants from enforcing them.

**JURISDICTION AND VENUE**

11. This Court has subject matter jurisdiction over Plaintiff-Intervenors' claims pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 1331, because such claims arise under the First and Fourteenth Amendments to the United States Constitution.

12. Venue is proper in this Court because a substantial part of the events giving rise to this action occurred in this district, *see* 28 U.S.C. §1391(b)(2), and because almost all Plaintiff-Intervenors are residents of the State of New York and Defendants are state officials who maintain an office in Albany, New York. *See* 28 U.S.C. § 1391(b)(1).

**PARTIES INTERVENING AS PLAINTIFFS**

13. Plaintiff-Intervenor Green Party of New York was formed in 1992 and is affiliated with the Green Party of the United States, which is the fourth-largest political party in the United States. GPNY's "four pillars" are peace, ecology, social justice, and democracy. GPNY first became ballot-qualified in New York in 1998. It lost that status in 2002 but qualified again from 2010 through 2020, when it lost that status again after New York increased its ballot-retention requirement. GPNY seeks to elect candidates to all levels of public office in New York, but it is unable to qualify for the ballot because it lacks the resources necessary to conduct a statewide petition drive. GPNY is injured by the burden and expense that New York's statutory scheme

imposes on GPNY, which diminishes its capacity to participate effectively in New York's electoral process and hinders GPNY's ability to grow and develop as a political party.

14. Plaintiff-Intervenor Libertarian Party of New York is the New York State affiliate of the Libertarian Party, which is the third largest political party in the United States. LPNY is committed to America's heritage of freedom: individual liberty and personal responsibility, a free market economy of abundance and prosperity, a foreign policy of non-intervention, peace, and free trade. LPNY conducted successful statewide petition drives in New York every two years from 1974 through 2018 (except 1986), but has been unable to do so since 2020, when New York increased its signature requirement. LPNY seeks to elect candidates to all levels of public office in New York, but it is unable to qualify for the ballot because it lacks the resources necessary to conduct a statewide petition drive. LPNY is injured by the burden and expense that New York's statutory scheme imposes on LPNY, which diminishes its capacity to participate effectively in New York's electoral process and hinders LPNY's ability to grow and develop as a political party.

15. Plaintiff-Intervenor Dr. Jill Stein is the Green Party's 2024 nominee for president. Dr. Stein was also the Green Party's presidential nominee in 2012 and 2016, and she successfully qualified for New York's ballot in both elections. Dr. Stein received 469,501 votes nationwide in the 2012 presidential election and 1,457,216 votes nationwide in 2016. Dr. Stein and JSFP spent considerable time, energy, and money to qualify her for New York's ballot in 2024 but were unable to do so. Dr. Stein wishes to campaign for and speak and associate with GPNY's candidates in future elections, and she is harmed by their inability to qualify for New York's general election ballot. Dr. Stein is also harmed by the burden and expense that New York's statutory scheme imposes on GPNY, which diminishes GPNY's capacity to participate effectively in New York's

electoral process and hinders its ability to grow and develop as a political party in New York and nationwide.

16. Plaintiff-Intervenor Gloria Mattera is co-Chair of GPNY. Mattera is a registered member of GPNY and resides in King County, New York where she intends to remain and vote in future elections. Mattera seeks to campaign for, speak and associate with, and vote for GPNY Party candidates, and she is harmed by the burden and expense that New York's statutory scheme imposes on GPNY candidates, which diminishes GPNY's capacity to participate effectively in New York's electoral process and hinders its ability to grow and develop a political party and deprives Mattera and other voters of electoral representation.

17. Plaintiff-Intervenor Howie Hawkins was GPNY's candidate for Governor in 2010, 2014, and 2018, and for President in 2020, and he qualified for the ballot in each of those elections. Hawkins resides in Onondaga County, New York, where he intends to remain and vote in future elections. Hawkins is a registered and active member of GPNY who serves on the GPNY State Committee. Hawkins wishes to vote for Dr. Stein in the 2024 presidential election and he is harmed by her exclusion from New Yorks' general election ballot. Hawkins seeks to campaign for, speak and associate with and vote for GPNY candidates in future elections, and he is harmed by the burden and expense that New York's statutory scheme imposes on GPNY candidates, which diminishes GPNY's capacity to participate effectively in New York's electoral process and hinders its ability to grow and develop a political party in New York and nationwide and deprives Hawkins and other voters of electoral representation.

18. Plaintiff-Intervenor Crystal Sharadin was the GPNY Queens County Regional Coordinator for petitioning for JSFP. Sharadin is a registered member of GPNY and resides in Queens County, New York, where she intends to remain and vote in future elections. Sharadin

seeks to campaign for, speak and associate with, and vote for GPNY Party candidates, and she is harmed by the burden and expense that New York's statutory scheme imposes on GPNY candidates, which diminishes GPNY's capacity to participate effectively in New York's electoral process and hinders its ability to grow and develop a political party and deprives Sharadin and other voters of electoral representation.

19. Plaintiff-Intervenor Margaret Walton is a volunteer for GPNY and serves on the GPNY State Committee. Walton is a registered member of GPNY and resides in New York County, New York where she intends to remain and vote in future elections. Walton seeks to campaign for, speak and associate with, and vote for GPNY Party candidates, and she is harmed by the burden and expense that New York's statutory scheme imposes on GPNY candidates, which diminishes GPNY's capacity to participate effectively in New York's electoral process and hinders its ability to grow and develop a political party and deprives Walton and other voters of electoral representation.

20. Plaintiff-Intervenor Andrew Kolstee is chair of the LPNY. Kolstee is a registered LPNY voter and resides in Chautauqua County, where he intends to remain and vote in future elections. Kolstee seeks to campaign for, speak and associate with, and vote for LPNY candidates, and is harmed by the burden and expense that New York's statutory scheme imposes on LPNY candidates, which diminishes LPNY's capacity to participate effectively in New York's electoral process and hinders its ability to grow and develop a political party in New York and nationwide and deprives Kolstee and other voters of electoral representation.

21. Plaintiff-Intervenor Mark Braiman is a volunteer for LPNY and serves as its Secretary. Braiman is a registered LPNY voter and resides in Madison County, where he intends to remain and vote in future elections. Braiman seeks to campaign for, speak and associate with,

and vote for LPNY candidates, and is harmed by the burden and expense that New York's statutory scheme imposes on LPNY candidates, which diminishes LPNY's capacity to participate effectively in New York's electoral process and hinders its ability to grow and develop a political party and deprives Braiman and other voters of electoral representation.

22. Plaintiff-Intervenor Richard Purtell is second Vice Chair of LPNY. Purtell is a registered LPNY voter and resides in Tioga County, where he intends to remain and vote in future elections. Purtell seeks to campaign for, speak and associate with, and vote for LPNY candidates, and is harmed by the burden and expense that New York's statutory scheme imposes on LPNY candidates, which diminishes LPNY's capacity to participate effectively in New York's electoral process and hinders its ability to grow and develop a political party and deprives Purtell and other voters of electoral representation.

## FACTUAL ALLEGATIONS

### Relevant History of New York Election Law

23. New York first adopted an official state ballot in the 1890 election cycle. *See* 1890 Session Laws, Ch. 262, pp. 482-484. To qualify for inclusion, candidates were required to submit nomination petitions signed by 1,000 qualified voters. *See id.* There was no time limit on collecting the required signatures, which were due only 25 days before the election. *See id.*

24. In 1891 New York raised its signature requirement to 3,000. *See* 1891 Session Laws, Ch. 296, p.575. In 1896 New York raised the signature requirement to 6,000. *See* 1896 Session Laws, Ch. 909, p.932. New York raised it again in 1918, to 12,000 signatures, where it remained unchanged until 1971. *See* 1918 Session Laws, Ch. 323, p. 1040.

25. For all that time, from 1891 until 1971, New York's petitioning period was virtually unlimited, because New York did not establish a start date.

26. In 1971 New York raised its signature requirement to 20,000, and added the prohibition against petitioning more than six weeks prior to the filing deadline, which remains in effect. *See* 1971 Session Laws, Ch. 1093, p. 2705; *see also* Section 6-138(4).

27. In 1992 New York set its signature requirement at 15,000, *see* 1992 Session Laws, Ch. 79, p 616, where it remained until New York tripled it pursuant to Section 6-142(1), which first took effect in 2020.

28. Section 1-104(3), which also took effect in 2020, increased the threshold for a party to remain ballot-qualified from 50,000 votes for governor – every four years – to 130,000 votes or 2% of the vote, whichever is greater, for governor *and* president – every two years.

29. From 1992 through 2018, New York's elections were orderly and well-regulated. Its general election ballots were not overcrowded, and there were no significant instances of voter confusion or any other problems arising from the inclusion of too many candidates, or candidates who were unqualified.

### New York's Current Ballot Access Requirements Are Severely Burdensome

30. New York's 45,000-signature requirement imposed by Section 6-142(1) is among the highest in the nation. It is higher than every other state's except California and Texas, when each state's easiest method is used.

31. New York's May 28, 2024 filing deadline imposed by Section 6-158(9) is earlier than every other state's except Texas and North Carolina.

32. Pursuant to Section 6-138(4), New York also prohibits petitioning for ballot access more than six weeks prior to the filing deadline. As that provision applied in 2024, Plaintiff-Intervenors were prohibited from petitioning prior to April 16th.

33. The 43-day petitioning period that Sections 6-158(9) and 6-138(4) established, combined with the 45,000-signature requirement imposed by Section 6-142(1), make New York's ballot access requirements the second most restrictive in the nation. To comply with those provisions, it is necessary to obtain 1,047 valid signatures per day, on average. No other state except Texas requires that so many signatures be obtained in such a short time, and Texas does not impose any signature distribution requirement, as New York does.

**New York's 134-Year Old Petitioning Procedure Exacerbates the Burdens Imposed**

34. In the 134 years since New York began regulating ballot access, the burden and expense that its statutory scheme imposes on independents and unqualified parties has increased exponentially. That is because they must collect a far greater number of signatures in the same fixed period, and because New York's petitioning procedure itself is obsolete and inadequate to the task. Collecting signatures by hand is inherently time-consuming, labor-intensive and expensive, and at each step in the process, the inefficiency of the procedure compounds the severity of the burden of complying with it. The large number of signatures that New York now requires independents and unqualified parties to collect in a short time therefore requires a massive expenditure of funds and resources.

35. To collect 45,000 signatures, many thousands of separate petition sheets must be distributed, circulated, returned, organized and reviewed prior to submission. Additionally, to ensure that the distribution requirement imposed by Section 6-142(1) is met, every petition signer must be looked up in the voter rolls to determine their congressional district – a time-consuming process that must be repeated until the distribution requirement is met.

36. Because petitioning generally still must be done – a quarter of the way into the 21st Century – on busy sidewalks or public spaces, using a clipboard or another makeshift writing

surface, the handwriting is often difficult or impossible to discern. Petition signers also frequently omit information or enter it incorrectly. As a result, many signatures cannot be verified, making it necessary to collect even more signatures to compensate for those that are illegible. Further, many people sign petitions even though they are not registered voters or they have signed another petition in violation of Section 6-138(1).

37. Petition circulators have no practicable method of confirming, in real time, that a petition signer is eligible and has properly and legibly entered the required information. It is therefore necessary to collect at least 50 percent more signatures than required – or 67,500 – to ensure a sufficient number of valid signatures.

38. Petitioning is physically and mentally taxing work that few people can do successfully. It requires long hours on your feet actively engaging with as many voters as possible. But voters who support a candidate's right to participate in an election are often unwilling to stop in public and provide their signatures and personal information to an unknown petition circulator. Other potential signers may be confrontational, threatening or abusive. Additionally, political adversaries or unscrupulous petition circulators can sabotage paper nomination petitions by deliberately signing ineligible or fraudulent names.

39. Inclement weather can make petitioning all but impossible on any given day, effectively shortening the petitioning period. The availability of suitable locations where there is sufficient foot traffic is also limited, because not every public sidewalk is a traditional public forum where petitioning is permitted, and petitioning on private property such as shopping centers is frequently prohibited. Further, local officials and property owners are frequently unaware of petition circulators' First Amendment rights. Consequently, petition circulators are often forced to

relocate, losing valuable time in the process, even when they are engaged in First Amendment protected conduct. All these factors can lower petition circulators' productivity.

40. The massive undertaking necessary to collect 45,000 valid signatures – and to satisfy the signature distribution requirement – in six weeks makes it impossible, as a practical matter, to rely on volunteers alone. Paid petition circulators must be hired.

### Plaintiff-Intervenors' History of Ballot Access in New York

41. In 2016 the Green Party fielded a candidate for president in forty-four states, including New York, and the District of Columbia. GPNY first achieved ballot status in New York in 1998 when its candidate for governor received 52,533 votes. GPNY lost ballot status in 2002 when it failed to meet the previous threshold of 50,000 votes for Governor. From 2010 through 2020, however, GPNY remained ballot-qualified by receiving the following vote totals for governor: 59,906 votes in 2010; 184,419 votes in 2014; and 103,946 votes in 2018. GPNY lost its status as a ballot-qualified political party as of November 2020 when New York increased the required vote threshold from 50,000 to 130,000, or two percent of the total vote, whichever is greater, and required parties to comply with it in both gubernatorial and presidential election cycles. In 2020, 2% of the presidential vote was more than 173,000 votes.

42. In 2016 the Libertarian Party fielded a candidate for president on the ballot in all fifty states and the District of Columbia. From 1972 through 2018, LPNY operated as an independent nominating committee under Section 1-104(12) and petitioned for its candidates to appear on the ballot. LPNY successfully qualified candidates for statewide or presidential office every two years since 1974 (except for 1986), and first became ballot-qualified in New York in 2018 after its candidate for governor received 95,033 votes. LPNY lost its status as a ballot-qualified political party as of November 2020 when New York increased the required vote

14

threshold from 50,000 to 130,000, or two percent of the total vote, whichever is greater, and required parties to comply with it in both gubernatorial and presidential election cycles. In 2020, 2% of the presidential vote was more than 173,000 votes.

**Plaintiff-Intervenors Were Unable to Comply With New York's Ballot Access Requirements in 2024 Despite Dedicating Substantial Funds and Resources to Their Efforts**

43. Plaintiff-Intervenors neither possess the funds needed to comply with New York's statutory scheme as currently applied, nor do they have the means to raise such exorbitant sums.

44. Notably, Team Kennedy completed the only petition drive that complied with New York's newly-increased signature requirement, and that effort cost $1.1 million.

GPNY's 2024 Petition Drive

45. To qualify for New York's 2024 general election ballot, GPNY and JSFP relied on more than 100 volunteer and paid petition circulators. Nine volunteer Regional Coordinators were each in charge of a specific region in the state, with two additional coordinators who oversaw the statewide effort. A team of drivers also worked to pick up petitions throughout the state and return them for organizing, processing and review prior to submission.

46. All told, GPNY and JSFP spent approximately $368,000.00 on their 2024 petition drive – primarily to pay petition circulators, but also for materials and supplies, transportation and related costs. The effort ultimately yielded approximately 42,000 signatures in total – less than the 45,000 valid signatures required by Section 6-142(1). Dr. Stein therefore did not qualify for New York's 2024 general election ballot.

LPNY's 2018, 2022 and 2024 Petition Drives

47. To secure ballot status in 2018, LPNY spent $71,247.07 on its petition drive. LPNY retained nine paid petitioners who collected 12,604 signatures and engaged approximately 350 volunteers who collected 18,854 signatures, for a combined total of 31,458 signatures.

15

48. LPNY lost its status as a ballot-qualified party in November 2020, when it was unable to comply with the newly-increased requirement for retaining access.

49. In 2022, after losing ballot status, LPNY mounted another petition drive. It recruited a total of 538 petition circulators, approximately 142 of whom were paid. LPNY spent at least $279,376.31 on the effort but still fell just short of the newly-increased 45,000-signature requirement, securing more than 42,000 signatures. LPNY did not qualify for the ballot in 2022.

50. LPNY commenced efforts to launch a petition drive in 2024, but learned that the cost of paid petitioner circulators had increased exponentially since 2022. LPNY estimated that it would cost a minimum of $800,000 to $1 million to conduct a successful petition drive in 2024.

51. When donors learned the projected cost of a petition drive in 2024, many did not contribute given the near impossibility of raising such exorbitant sums and the uncertainty of success.

52. Similarly, volunteers who had for many years circulated petitions no longer believed it was possible to regain ballot status on behalf of LPNY. As a consequence, many individuals ceased volunteering their time and effort after 2022. In 2024, LPNY had only 63 volunteers as compared to the nearly 400 individuals who volunteered for LPNY's petition drive in 2022.

**New York Grants Major Party Nominees Automatic Ballot Access at Taxpayer Expense**

53. Major political party nominees face none of the foregoing burdens that unqualified candidates and parties face. Instead, they appear on New York's general election ballot automatically, once they are selected in taxpayer-funded primary elections. The major political parties need not expend any funds or resources to comply with the procedures by which their nominees qualify for the general election ballot.

### New York's Current Ballot Access Requirements Cannot Be Justified by Any Legitimate or Compelling State Interest

54. New York's nomination petition procedure is not sufficiently tailored to serve the State's interest in limiting ballot access to candidates who have demonstrated a modicum of public support. The procedure excludes those who lack sufficient resources, like Plaintiff-Intervenors, even if they have substantial public support, while providing wealthy candidates and parties a means of gaining ballot access even if they lack the requisite support.

55. New York's 45,000-signature requirement, and its signature distribution requirement, are far greater than necessary to protect any legitimate regulatory interest.

56. New York's May filing deadline is far earlier than necessary to protect any legitimate regulatory interest.

57. No legitimate state interest can justify New York's categorical prohibition against petitioning until six weeks before the filing deadline.

### New York's Ballot Access Requirements Infringe Plaintiff-Intervenors' First and Fourteenth Amendment Rights

58. As a result of New York's arduous ballot access requirements and inefficient petitioning procedures, unqualified statewide candidates and parties can only secure ballot status by spending exorbitant amounts of money. The financial barrier to entry that New York's statutory scheme now imposes upon unqualified statewide candidates and parties, including Plaintiffs-Intervenors, is near-absolute.

59. By imposing a near-absolute barrier to their participation in its electoral process, New York's statutory scheme severely burdens Plaintiffs-Intervenors' First and Fourteenth Amendment rights to cast their votes effectively, to speak and associate for political purposes, and to the equal protection of law. Plaintiffs-Intervenors' exclusion from the electoral process harms

their ability to engage in political speech for purposes of influencing the public debate and prevents them from representing the interests of their voter-supporters within the electoral arena, as well as the interests of all voters who desire more meaningful choices on the general election ballot. It also denies them one of the most valuable opportunities of building voter support for their political platforms – by running candidates for public office – and dissuades voters from supporting them. Plaintiffs-Intervenors' exclusion further harms their ability to raise and spend funds to promote their political goals in New York and nationwide.

## CAUSES OF ACTION

## COUNT I

**(Violation of Plaintiffs' Rights Guaranteed by the First and Fourteenth Amendments)**

60. Plaintiff-Intervenors reassert each preceding allegation as if set forth fully herein.

61. The statutory provisions challenged herein – Section 6-138, Section 6-158(9), Section 6-142(1), Section 6-140 and Section 1-104(3) – as applied separately and in conjunction with one another, impose substantial and severe burdens on unqualified parties and independent candidates, and on voters who support or may wish to support them, which are not justified by any legitimate or compelling state interest.

62. These provisions, as applied separately and in conjunction with one another, both cause injury to and violate rights guaranteed to Plaintiff-Intervenors by the First and Fourteenth Amendments to the U.S. Constitution.

## COUNT II

**(Violation of Plaintiffs' Rights Guaranteed by the Fourteenth Amendment)**

63. Plaintiff-Intervenors reassert each preceding allegation as if set forth fully herein.

64. New York's ballot access requirements for unqualified candidates and parties, and specifically those statutory provisions enumerated in Count I of this Complaint, as applied separately and in conjunction with one another, both cause injury to and violate rights guaranteed to Plaintiffs by the Equal Protection Clause of the U.S. Constitution.

## PRAYER FOR RELIEF

65. WHEREFORE, Plaintiff-Intervenors respectfully request that this Court:

   A. Enter a declaratory judgment holding that New York's statutory scheme regulating ballot access for unqualified candidates and parties is unconstitutional as applied to Plaintiff-Intervenors, and that the following statutory provisions are unconstitutional as applied separately and in conjunction with one another: Section 6-138, Section 6-158(9), Section 6-142(1), Section 6-140 and Section 1-104(3);

   B. Enter an order enjoining Defendants from enforcing the provisions enumerated in paragraph 65.A as applied to Plaintiff-Intervenors;

   C. Award such other and further relief as the Court deems proper and just;

   D. Award Plaintiff reasonable attorney fees and costs associated with the prosecution of this action pursuant to 42 U.S.C. § 1988; and

   E. Retain jurisdiction of this action and grant Plaintiff-Intervenors any further relief which may in the discretion of the Court be necessary and proper.

Dated: August 2, 2024

Respectfully submitted,

/s/Melissa Cowan
Melissa L. Cowan
*MORE VOTER CHOICE FUND*
8 Mosher Place
West Hurley, NY 12491
845-706-3303
melissa@morevoterchoicefund.org
NY Bar Number: 5441860

Oliver Hall*
CENTER FOR COMPETITIVE DEMOCRACY
P.O. Box 21090
Washington, DC, 20009
(202) 248-9294

oliverhall@competitivedemocracy.org
DC Bar No. 976463
*Counsel for Plaintiff-Intervenors*
\*Motion for admission *pro hac vice* forthcoming