UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X

TEAM KENNEDY, AMERICAN VALUES 2024,      **Case No. 24-cv-3897-ALC**
AND JEFFREY ROSE,

                *Plaintiffs*,

      -against-

HENRY T. BERGER, in his official            **FIRST AMENDED COMPLAINT**
capacity as the Co-Chair of the New York
State Board of Elections; PETER S.
KOSINSKI, in his official capacity as the
Co-Chair of the New York State Board of
Elections; ESSMA BAGNUOLA, in her
official capacity as a Commissioner of the
New York State Board of Elections;
ANTHONY J. CASSALE, in his official
capacity as a Commissioner of the New
York State Board of Elections; KRISTEN
ZEBROWSKI STAVISKY, in her official
capacity as Co-Executive Director of the
New York State Board of Elections;
RAYMOND J. RILEY, III, in his official
Capacity as Co-Executive Director of the
New York State Board of Elections; and,
LETITIA JAMES, in her official capacity
as the Attorney General of the state of
New York,

                *Defendants*.
------------------------------------------------------------ X

Gary L. Donoyan, Esq.            Paul A. Rossi, Esq.
Law Office of Gary L. Donoyan    (*pro hac vice* forthcoming)
565 Plandome Road #209         316 Hill Street Suite 1020
Manhasset, NY  11030           Mountville, PA  17554
516.312.8782                     717.961.8978
gdonoyan@verizon.net          Paul-Rossi@comcast.net

*Counsel for Team Kennedy*       *Counsel for Team Kennedy*

Jim Walden, Esq.
Walden Macht Haran & Williams
250 Vesey Street, 27th floor
New York, New York
jwalden@wmhwlaw.com

*Counsel for Team Kennedy*

Jed Rubenfeld, Esq.
1031 Forest Rd.
New Haven CT 06515
203-432-7631
jed.rubenfeld@yale.edu

*Counsel for AV2024, Jeffrey Rose*

**INTRODUCTION**

1.      Forty years ago, Ohio's Secretary of State barred independent presidential candidate John Anderson from that state's ballot because—although Anderson had collected the requisite number of signatures from Ohio voters—he missed a filing deadline.  But in *Anderson v. Celebrezze*, the U.S. Supreme Court held that Anderson's exclusion from the ballot was unconstitutional.[1]  Ohio's interests in strictly enforcing its filing deadline did not outweigh the First and Fourteenth Amendment rights at stake[2]—in particular, the "right of voters to associate and ***to have candidates of their choice placed on the ballot***."[3]

2.      On August 13, 2024, a state judge in Albany, New York ordered the Board of Elections to remove independent presidential candidate Robert F. Kennedy, Jr. from that state's ballot because—although Mr. Kennedy had collected more than the requisite number of signatures from New York voters—the nominating petition bore an incorrect address.  *Cartwright v. Kennedy*, No. 906349-24, 2024 N.Y. Misc. LEXIS 3768 (N.Y. Sup. Ct. Albany Cnty. Aug. 13, 2024). The state court did not find that anyone was misled by the address, nor did the court identify any state interests that were compromised by its use.  Rather, the state court simply ruled that New York's policy of "strict compliance" with the state's petition regulations required Mr. Kennedy's name to be struck from the ballot.  *Id.* at *35-36.

3.      *Anderson v. Celebrezze* controls this case.  Under *Anderson*, the state court's ruling is plainly unconstitutional, violating the right of voters to have a candidate of their choice placed on the ballot.  Because New York will finalize its ballot in a matter of weeks, Plaintiffs seek, and *Anderson* mandates, immediate injunctive relief.

---

[1] *See* 460 U.S. 780 (1983).
[2] *Id.* at 806.
[3] *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (emphasis added).

4.     This Amended Complaint involves two interrelated issues: (1) whether New York can bar an independent presidential candidate—who has millions of supporters all over the country, and who has submitted over 100,000 otherwise valid signatures on their nominating petition—on the basis of an incorrect address; and (2) whether New York can constitutionally impose a gauntlet of onerous, unnecessary ballot access petition requirements, the result of which is to make it virtually impossible for an independent presidential candidate to obtain access to the ballot.

5.     Together, these two issues implicate profound threats to the democratic process, the freedom of speech, and the right to vote in New York.

6.     *First*, New York's requirement, as applied by the Albany Supreme Court, that an independent candidate for U.S. President must include his or her residence on the nominating petition—a burden *not* required of major-party candidates—unconstitutionally interferes with First Amendment rights of free speech and association, and also unconstitutionally expands the qualifications required of an individual in order to run for President.

7.     No legitimate state interests are served by this residence requirement: the Presidential election is the only *national* election and there is no state interest that a candidate reside in any particular state.

8.     For a Presidential election, apart from satisfying the Constitution's Qualification Clause requirement of living in the U.S. for 14 years, residence *does not matter*.

9.     *Second*, several of New York's ballot access requirements for independent presidential candidates unconstitutionally impose significant burdens on those candidates, including by: (1) invalidating petitions signed by circulators who signed a petition for another candidate; (2) requiring independent candidates to vet and name their electors in a short timeframe four-to-five months before the major-party candidates must do so; (3) invalidating signatories who

list their village rather than their city or town; (4) banning a campaign from compensating circulators on the basis of valid signatures obtained; and, above all, (5) requiring an exorbitant, unjustifiable number of signatures (45,000) to be collected in a period of six weeks.

10. These ballot access requirements serve to disadvantage independent presidential candidates so severely that no non-major-party presidential candidate was able to run this gauntlet in 2024 with the exception of Mr. Kennedy, who was then removed from the ballot under the strict residence requirement imposed by the state court decision challenged here.

11. For the reasons set forth below, Plaintiffs ask this Court to immediately enjoin the New York State Board of Elections ("NYSBOE") from removing Mr. Kennedy's name from the New York ballot and to declare unconstitutional the residence requirement and the other ballot access requirements described below.

**PARTIES**

12. Plaintiff TEAM KENNEDY is the campaign organization dedicated to the election of Robert F. Kennedy, Jr. as the next President of the United States and of Nicole Shanahan as the next Vice President of the United States.

13. Team Kennedy has spent more than $12 million dollars to secure Mr. Kennedy's and Ms. Shanahan's appearance on ballots all over the country, including over $1.1 million in New York alone.

14. Team Kennedy is a registered campaign committee with the Federal Elections Commission. Team Kennedy filed FEC Form 1, Statement of Organization on April 5, 2023. Team Kennedy's FEC Committee I.D. Number is C00836916. The address for Team Kennedy is: 124 Washington Street, STE 101, Foxborough, MA 02035.

15. Plaintiff AMERICAN VALUES 2024 ("AV24") is a super PAC committed to educating and mobilizing voters to elect candidates who will restore and protect the soul of

democracy in the United States. Currently, AV24 supports Mr. Kennedy's presidential campaign. AV24 has spent millions of dollars advocating for Mr. Kennedy and promoting his candidacy.

16.     Plaintiff JEFFREY ROSE is a New York citizen, Albany resident, and registered New York voter who supports Mr. Kennedy's candidacy; seeks to have Mr. Kennedy placed on New York's 2024 general election ballot; and signed Kennedy's petition that has been invalidated by the state court ruling at issue here.

17.     Defendant HENRY T. BERGER is Co-Chair of the New York State Board of Elections. He is sued in his official capacity. The New York State Board of Elections is an agency within the Executive Department of the state of New York and is responsible for administering and enforcing all laws relating to elections in the state of New York. Based on information and belief, Defendant Berger is a resident of the state of New York.

18.     Defendant PETER S. KOSINSKI is Co-Chair of the New York State Board of Elections. He is sued in his official capacity. The New York State Board of Elections is an agency within the Executive Department of the state of New York and is responsible for administering and enforcing all laws relating to elections in the state of New York. Based on information and belief, Defendant Kosinski is a resident of the state of New York.

19.     Defendant ESSMA BAGNUOLA is a Commissioner of the New York State Board of Elections. She is sued in her official capacity. The New York State Board of Elections is an agency within the Executive Department of the state of New York and is responsible for administering and enforcing all laws relating to elections in the state of New York. Based on information and belief, Defendant Bagnuola is a resident of the state of New York.

20.     Defendant ANTHONY J. CASSALE is a Commissioner of the New York State Board of Elections. He is sued in his official capacity. The New York State Board of Elections is

an agency within the Executive Department of the state of New York and is responsible for administering and enforcing all laws relating to elections in the state of New York. Based on information and belief, Defendant Cassale is a resident of the state of New York.

21. Defendant KRISTEN ZEBROWSKI STAVISKY is Co-Executive Director of the New York State Board of Elections. She is sued in her official capacity. The New York State Board of Elections is an agency within the Executive Department of the state of New York and is responsible for administering and enforcing all laws relating to elections in the state of New York. Based on information and belief, Defendant Stavisky is a resident of the state of New York.

22. Defendant RAYMOND J. RILEY, III is Co-Executive Director of the New York State Board of Elections. He is sued in his official capacity. The New York State Board of Elections is an agency within the Executive Department of the state of New York and is responsible for administering and enforcing all laws relating to elections in the state of New York. Based on information and belief, Defendant Riley is a resident of the state of New York.

23. Defendant LETITIA JAMES is the Attorney General of the state of New York. Defendant James is the chief legal and law enforcement officer of the state of New York.

24. Collectively, Defendants Berger, Kosinski, Bagnuola, Cassale, Stavisky, and Riley (the "NYSBOE Defendants") and Defendant James are the chief New York officials charged with enforcing the residence requirement, administering New York Election Law, overseeing production of the state's general election ballot, and executing the state court judgment challenged in this action.

**JURISDICTION AND VENUE**

25. This Court has jurisdiction under the U.S. Constitution, 28 U.S.C. § 1331, and 42 U.S.C. § 1983.

26.     Venue is proper because all Defendants reside in this state and at least one Defendant resides in this District; thousands of Kennedy petitions were collected in this District; the events in question substantially took place here; and/or several of the Defendants are subject to personal jurisdiction here.  28 U.S.C. § 1391(b)(1)-(3).

## FACTS

**Residence Requirement**

27.     Robert F. Kennedy, Jr. is an announced independent candidate for the office of President of the United States for the 2024 general election.

28.     Mr. Kennedy is the leading independent presidential candidate, receiving between 5% and 20% support in national polls taken at various times during the campaign.

29.     On August 13, 2024, a New York state court judge in Albany ordered that Robert F. Kennedy, Jr. be removed from that state's ballot as a candidate for President in the coming election. *See Cartwright v. Kennedy*, No. 906349-24, 2024 N.Y. Misc. LEXIS 3768 (N.Y. Sup. Ct. Albany Cnty. Aug. 13, 2024)

30.     The court so ruled notwithstanding the fact that Mr. Kennedy had submitted to New York election officials a nominating petition signed by over 100,000 New Yorkers seeking to have him appear on the ballot—more than twice the number that New York requires.

31.     The court so ruled notwithstanding the fact that this petition complied with the onerous, costly, and, in some cases, arcane requirements imposed by New York on ballot-access petitions, including the requirement for independent candidates that 45,000 valid signatures be collected between April 16 and May 28—a period of only 6 weeks.

32.     The court so ruled notwithstanding the fact that the New York Board of Elections had certified the validity of these more than 100,000 petition signatures and voted to place Mr. Kennedy on the ballot.

33.     Notwithstanding all this, the state court rejected the petition, holding it invalid on one basis and one basis alone: according to the court, it listed the wrong address for Mr. Kennedy.

34.     Under New York Election Law, each sheet of a ballot-access petition must show the candidate's "place of residence." The Kennedy petition listed the address of a house in New York where Mr. Kennedy pays rent and keeps personal belongings. The state court found that this address did not satisfy New York's definition of "residence," which is an individual's "fixed, permanent and principal home" to which he "intends to return."

35.     The state court did not find that any voters or petition-signers were misled by the supposedly incorrect address. Nor did the state court identify any state interests that were compromised by the supposedly incorrect address. Rather, the court simply held that New York has a rule of "strict compliance" with petition requirements and that under the "strict compliance" rule, the petition was invalid and Mr. Kennedy's name had to be struck from the ballot.

36.      Whether or not this ruling was correct under New York law, it was and is in plain violation of the U.S. Constitution.

37.     For avoidance of doubt: under the Constitution, presidential candidates are not like gubernatorial candidates, as to whom in-state residency can be required for ballot eligibility. An individual from any state can run for President in every state. A state has no constitutional right to—and New York does not purport to—require that an individual be an in-state resident in order to appear on the ballot as a candidate for President.

38.    By contrast, the "right of voters to associate and ***to have candidates of their choice placed on the ballot***" is well established.[4]

39.    Forty years ago, the Supreme Court enforced that right in a case that controls the outcome here.

40.    In *Anderson v. Celebrezze*, 460 U.S. 780 (1983), Ohio's Secretary of State had declared independent presidential candidate John Anderson ineligible to appear on the state ballot because, although Anderson collected the requisite number of signatures from Ohio voters, he missed the filing deadline. The Secretary of State's decision was unquestionably correct under Ohio law: Anderson's campaign had submitted the signatures on May 16, 1980, whereas Ohio's deadline was March 20.  Nevertheless, Anderson challenged the Secretary of State's decision in federal District Court and won.  The District Court issued an injunction ordering that Anderson's name appear on the ballot.  The Sixth Circuit reversed, but the United States Supreme Court reversed again, agreeing with the district court.

Said the Court:

Constitutional challenges to specific provisions of a State's election laws … cannot be resolved by any "litmus paper test" that will separate valid from invalid restrictions. Instead, a court … must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.

*Anderson*, 460 U.S. at 789 (internal citations omitted).

41.    Under this test, the Court found unconstitutional Ohio's attempt to exclude Anderson from the ballot, despite Anderson's having missed the filing deadline.

---

[4] *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (emphasis added).

42.     Of critical relevance to this case, the *Anderson* Court emphasized the First Amendment importance of "***figures outside the two major parties***" and the First Amendment rights of "independent-minded voters"—"***voters whose political preferences lie outside the existing political parties***." *Id*. at 793-94.

43.     Typically, such voters can exercise their right "to have candidates of their choice placed on the ballot" only through a ballot-access petitioning process, which (as here) is often subject to cumbersome and complex state regulation.

44.     The *Anderson* Court found that the Constitution not only protects but favors such petitioning by "independent-minded voters," because the First Amendment does not countenance two-party monopolization of the electoral process, and the ability of independent candidates to run for the presidency serves the First Amendment's "primary values":

> Historically, political figures outside the two major parties have been fertile sources of new ideas and new programs; many of their challenges to the status quo have, in time, made their way into the political mainstream. In short, the primary values protected by the First Amendment—'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open'—are served when election campaigns are not monopolized by the existing political parties.

45.     For these reasons, the *Anderson* Court concluded that while state filing deadlines of course serve important and legitimate interests, the First Amendment rights at stake were paramount, and the state interests supporting Ohio's choice to set its deadline nine months before the election could not justify completely blocking Anderson from the ballot.

46.     *Anderson* controls this case.  The constitutional rights injured are identical, and New York's interests are weaker than Ohio's.

47.     In fact, New York has no legitimate interest in applying its residency rule to a presidential candidate.

48.     New York's requirement that a ballot-access petition list the candidate's "place of residence" defined as the candidate's "fixed," "permanent home" (the "Residence Requirement" is set forth in a statute that applies to all elections, high and low, whether for town dogcatcher or President of the United States.

49.     With respect to all state elective offices, states can lawfully impose residency requirements on candidates.  Typically, in New York, a candidate for office in a given political unit is required to reside in that political unit.  The governor must be a state resident; a town selectman must be a resident of that town.

50.     Even for United States Senators and Representatives, states can make in-state residency a condition of ballot eligibility, because the Constitution itself requires that candidates for the Senate and House shall be an "inhabitant" of the state they seek to represent.

51.     Thus, for nearly all elective offices, states undoubtedly have a substantial, legitimate interest in ensuring that the candidate has a home in the state and in ascertaining the location of that home.  New York's Residence Requirement serves that interest.

52.     But none of this applies to the Presidency.

53.     States cannot impose any kind of in-state residency requirement on a candidate for President.  They cannot require that he live in-state, they cannot require that he be registered to vote in-state, and they cannot require that he have a home in-state.

54.     Thus, when it comes to the Presidency, New York's Residence Requirement does not serve the interest it serves with respect to virtually all other electoral offices.

55.     Instead, as applied to the Presidency, that requirement serves no legitimate state interests at all.

56. If the state has an interest in obtaining from the candidate an address for service of process, it could achieve that interest without asking the candidate to publicly disclose his home address.

57. If the state has any other interests served by the Residence Requirement, the state court did not identify them.

58. If the state had any weighty interest served by the Residence Requirement, it would impose that requirement not merely on independent presidential candidates, but on party-nominee presidential candidates as well.

59. But New York does not do so. Presidential candidates nominated at the national convention of the Democratic Party, the Republican Party, or any other recognized party are automatically placed on the New York ballot. They do not have to disclose their place of residence.

60. Under *Anderson*, a state's interest in "strict compliance" with its petitioning rules cannot outweigh First Amendment rights; if it could, Ohio's insistence on strict compliance with its filing deadline would then have been constitutional.

61. In fact, as applied to the Presidency, the Residence Requirement is simply an arbitrary artifact of New York's one-size-fits-all statutory scheme regulating all ballot-access petitioning, in which a residency requirement that makes sense for town selectmen and all other state officers happens to apply as well to the Presidency.

62. Accordingly, under *Anderson*, the state court's decision to strike Mr. Kennedy from the ballot is unconstitutional and must be enjoined.

63. The Board of Elections thereafter certified the validity of over 100,000 of those petition signatures and voted for Mr. Kennedy to be placed on the ballot.

64. Suit was brought by objectors in New York Supreme Court challenging the petition.

65.     On August 13, 2024, the state court issued its decision and judgment, ordering the NYSBOE to remove Mr. Kennedy from the ballot on the ground that his petition listed an incorrect address for him.

66.     Mr. Kennedy has homes in California, New York, and Massachusetts.

67.     His home in New York is a house in Katonah where he pays rent and keeps personal belongings.

68.     Mr. Kennedy is registered to vote in New York, pays income taxes in New York, has his drivers' license from New York, holds professional and recreational licenses in New York, and has testified under oath that he intends to return to New York.  These facts and others made it reasonable for Mr. Kennedy and Team Kennedy to believe that Mr. Kennedy's state of residence is New York, and Team Kennedy was advised by counsel that the Katonah address satisfied New York's definition of residence.

69.     For those and other reasons, the Kennedy petitions listed Mr. Kennedy's New York address as his place of residence.  Because in some states (such as Maine) the candidate's residence must be the state where he is registered to vote, and because of concern that use of different places of residence on Kennedy petitions in different states could trigger costly and uncertain challenges, Team Kennedy, on the advice of counsel, used the same address on Kennedy petitions wherever states required the candidate to list a residence.

70.     Nicole Shanahan is a California resident, and her residence has not been disputed.

71.     On August 13, the state court ruled that Mr. Kennedy's New York home is not his residence as New York Election Law defines it.

72.     By then, New York's window for petition-collection had long since closed, and the (supposed) error in the petitions could not be corrected.

73.     On September 11, 2024, the NYSBOE will issue its final certification of the 2024 general election ballot.  To avoid irreparable harm, Defendants must be ordered before that date to restore Mr. Kennedy's name to the ballot.

**Ballot Access**

74.     In order to secure ballot access, Team Kennedy has, on behalf of Mr. Kennedy and Ms. Shanahan: (1) accepted the nomination of several state political parties with preexisting ballot access;[5] (2) paid filing fees to secure direct ballot access;[6] (3) assisted local supporters who formed new political parties in order to secure ballot access in certain states;[7] and (4) circulated ballot access petitions for voters to record their support for the Kennedy/Shanahan ticket and timely filed them with 40 states and the District of Columbia to secure ballot access for the general election.[8]

75.     As part of the petition circulation component of the 50-state ballot access drive, Team Kennedy collected over 1,000,000 signatures from voters at a total estimated cost of $12,000,000.00.  In New York alone, Plaintiff Team Kennedy spent over $1,100,000 to collect and file ballot-access petitions for Mr. Kennedy to secure general election ballot access.

---

[5] Team Kennedy has accepted the nomination of the Kennedy/Shanahan ticket as the presidential and vice-presidential nominees for the American Independent Party in California; the Natural Law Party in Michigan; the Delaware Independent Party in Delaware; the Alliance Party in South Carolina; and the Reform Party in Florida.

[6] Team Kennedy paid ballot access filing fees in Oklahoma and Louisiana to secure ballot access for the 2024 general election.

[7] Local supporters in Hawaii, Oregon and North Carolina formed new political parties and then nominated or have expressed their intent on nominating the Kennedy/Shanahan ticket as their nominees for President and Vice President of the United States for the 2024 general election.

[8] Team Kennedy organized, circulated and either timely filed or intends to timely file ballot access petitions containing a number of signatures sufficient to demonstrate that the Kennedy/Shanahan national ticket enjoys sufficient local support to secure ballot access for the 2024 general election in: Alabama, Alaska, Arizona, Arkansas, Colorado, Connecticut, the District of Columbia, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas, Kentucky, Maine, Maryland, Massachusetts, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Dakota, Ohio, Pennsylvania, Rhode Island, South Dakota, Tennessee, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin and Wyoming.

76.     In the vast majority of states, Plaintiff Team Kennedy's volunteer and professional petition circulators collected a multiple number of signatures in excess of the minimum number of signatures required and timely filed to secure ballot access within a state.

77.     Team Kennedy has worked assiduously to secure ballot access on New York's general election ballot for Mr. Kennedy and Nicole Shanahan for the office of President and Vice President of the United States.

78.     Under New York law, Team Kennedy was required to circulate nominating petitions to collect the signatures, printed names, street address, city or town (or county if the voter resides in New York City) of registered New York voters and the date the voter signs the nominating petition to place Robert F. Kennedy, Jr. and Nicole Shanahan on the 2024 New York general election ballot for the offices of President and Vice President of the United States.

79.     The names of Robert F. Kennedy, Jr. and Nicole Shanahan are required to be printed on the nominating petition used to collect signatures to secure ballot access in the state of New York.

80.     In addition to the names of Robert F. Kennedy, Jr. and Nicole Shanahan, Team Kennedy is also required to name and print on the nominating petition the names of 28 presidential electors pledged to cast their votes for Robert F. Kennedy, Jr. and Nicole Shanahan for the office of President and Vice President of the United States in the 2024 electoral college.

81.     Presidential candidates for the major political parties are not required to publicly name their slates of presidential electors until after their national nominating conventions held in July and August of a presidential election year.

82.     Providing independent presidential candidates less time to select their slate of presidential electors is an unequal application of the law.

83. Independent presidential candidates have less time than presidential candidates for the major political parties to discover any fact which would disqualify an elector from serving in New York's electoral college.

84. If it is discovered that a presidential elector is not qualified to serve as a presidential elector after their name has been printed on a nominating petition, the disqualification threatens to invalidate the entire nominating petition and deny ballot access to an independent presidential candidate in New York.

85. Candidates seeking the nomination of a major political party are not required to name their slate of presidential electors in New York until after receiving their party's nomination and access to New York's general election ballot.

86. The first date Plaintiff Team Kennedy was permitted to circulate nominating petitions was Tuesday, April 16, 2024.

87. Plaintiff Team Kennedy was required to file with the NYSBOE a nominating petition containing a minimum of 45,000 valid signatures from registered voters of the state of New York no later than May 28, 2024.

88. Voters are required to personally sign the nominating petition.

89. Either the voter or the person circulating the nominating petition or some other person may record the printed name, street address and city or town (or county for voters registered in New York City) of the registered voter and the date the voter signed the petition.

90. Other than the voter's signature and the date, Plaintiff Team Kennedy is permitted, prior to filing, to correct the street address and city or town (or county if the voter is registered in New York city) for each signer of the petition.

91.     Failure to record the exact name and street address and city or town (or county for voters registered in New York city) as recorded on the voter's registration record threatens to invalidate a signature if the signature is subject to a private challenge after the nominating petition is filed.

92.     The New York voter file does not exclusively require voters to be identified by their city or town of residence.

93.     Significant portions of the New York voter file designate voters by the village of their residence.

94.     The New York voter file does not conform to the rules governing the designation of voters by only their city or town on the nominating petition.

95.     The failure of the New York voter file to comply with the city or town designation of registered voters makes it impossible for Plaintiff Team Kennedy to validate many nominating petition signatures prior to filing with the NYSBOE Defendants.  Plaintiff Team Kennedy hired the most accurate and reliable petition verification firm to report to Plaintiff with a 5% margin of certainty the number of valid signatures collected in each state, including New York.

96.     Because Plaintiff Team Kennedy cannot validate the required city or town designation of voters, it must collect many thousands of additional petition signatures to compensate for the inability to correct a voter's recorded village with the required city or town designation.

97.     Furthermore, even if Plaintiff Team Kennedy can correct a recorded village with the corresponding city or town, the discrepancy between the nominating petition and the New York voter files threatens to trigger a large number of unnecessary and invalid specific challenges to Plaintiff Team Kennedy's nominating petition signatures.

98. Due to the fact the New York voter file does not limit its data to city or town designations for registered voters, the NYSBOE Defendants lack any legitimate state interest to continue to enforce the challenged restriction of Section 6-130 of the New York Election Law.

99. Plaintiff Team Kennedy used volunteer and professional petition circulators in New York to collect the required number of 45,000 valid petition signatures to secure access for Robert F. Kennedy, Jr. and Nicole Shanahan for New York's 2024 general election ballot.

100. The U.S. Supreme Court has established that the First and Fourteenth Amendments to the U.S. Constitution guarantees Plaintiff Team Kennedy the right to use and compensate professional petition circulators to assist in the collection of the required number of valid petition signatures to secure ballot access for New York's 2024 general election.

101. Defendants are charged with enforcing a limit on the established right to compensate professional petition circulators through a ban on compensating professional petition circulators based on the number of valid petition signatures collected–the Valid Per-Signature Compensation Ban.

102. As a direct and proximate result of New York's ban on valid per-signature compensation, Plaintiff Team Kennedy is forced to compensate professional petition circulators up to $90.00 per hour for the collection of nominating petition signatures.

103. Plaintiff Team Kennedy is required to pay professional petition circulators no matter how few signatures a circulator collects.

104. If a petition circulator reports to Plaintiff Team Kennedy that he/she worked 8 hours, at $90.00 per hour and only collected 1 signature, Plaintiff Team Kennedy is legally required to pay that petition circulator $720.00 for a single signature.

105.    While Plaintiff Team Kennedy may terminate the services of a petition circulator who collects only 1 signature during an 8-hour shift, it is still legally required to pay that circulator $720.00 for that single signature.

106.    Under a valid per-signature compensation model, that single signature, if valid, would only cost Plaintiff Team Kennedy about $12.00 to $15.00.

107.    New York's Valid Per-Signature Compensation Ban forces Plaintiff Team Kennedy to provide compensation for circulators who engage in fraud.

108.    New York's ban on valid per-signature compensation imposes the only compensation model which requires Plaintiff Team Kennedy to compensate petition circulators who engage in fraud.

109.    Because Plaintiff Team Kennedy is required to compensate petition circulators for fraud, New York's ban on valid per-signature compensation encourages fraud.

110.    New York's Valid Per-Signature Compensation Ban permits Plaintiff Team Kennedy's political adversaries to infiltrate its petition drive, engage in fraud and then force it to compensate intentional petition fraud and sabotage with full compensation, all of which has the knock-on benefit for Plaintiff Team Kennedy's political enemies of reducing its campaign war-chest.

111.    Meridian Strategies and Dark Horse Strategies are petition firms aligned with the Democratic National Committee and prominent Democrats within the state of New York.

112.    Plaintiff was not aware of the political agenda of Meridian Strategies and Dark Horse Strategies before they were hired to circulate Plaintiff's nominating petitions in New York.

113.    New York Times reporters discovered and reported on Meridian Strategies and Dark Horse Strategies petition circulators engaging in actual fraud in the circulation of Plaintiff Team Kennedy's nominating petitions.

114.    The New York Times reported witnessing Meridian Strategies and Dark Horse Strategies petition circulators: (1) folding over the top of Plaintiff Team Kennedy's nominating petition to obscure the name of Robert F. Kennedy, Jr.; and then (2) telling voters that signing the petition was to support the progressive movement.

115.    Plaintiff Team Kennedy has discovered nominating petitions with obvious folds at the top of the nominating petition by Meridian Strategies and Dark Horse Strategies petition circulators which contain over 8,000 petition signatures.

116.    Plaintiff Team Kennedy was forced to provide full compensation to Meridian Strategies and Dark Horse Strategies for the 8,000 fraudulent "fold-over" nominating petition signatures.

117.    Plaintiff Team Kennedy excluded all 8,000 fraudulent nominating petition signatures from the filing to be made with NYSBOE Defendants on May 28, 2024.

118.    The total number of nominating petition signatures collected by Meridian Strategies and Dark Horse Strategies was over 30,000.

119.    As a sole result of New York's Valid Per-Signature Compensation Ban, Plaintiff Team Kennedy is forced to provide full compensation to Meridian Strategies and Dark Horse Strategies petition circulators for the time they spent engaged in fraudulent conduct.

120.    The total cost to Plaintiff Team Kennedy for the fraudulent signatures collected by Meridian Strategies and Dark Horse Strategies petition circulators was approximately $313,000.00.

121.    Under New York Election Law, Section 6-140(1)(b), any signature collected after a petition circulator signs a designating or nominating petition for a candidate for the same office is invalid.

122.    As a result of Section 6-140(1)(b), Plaintiff Team Kennedy's political opponents were permitted to hire Plaintiff Team Kennedy's petition circulators and tell them to sign the nominating petition for the Green Party's presidential candidate, thereby invalidating all of the nominating petition signatures subsequently collected by that petition circulator. Plaintiff Team Kennedy is still required to provide full compensation to any such petition circulator, despite the invalid signatures caused by the political manipulation scheme devised by its political opponents.

123.    Based on information and belief, the Republican Party and/or the campaign for Donald Trump hired Plaintiff Team Kennedy's petition circulators and instructed them to sign the nominating petition for the Green Party's presidential candidate as a condition precedent to receiving compensation.

124.    As a result, any petition signature subsequently collected by Plaintiff Team Kennedy's petition circulators after they accepted payment and signed the nominating petition for the Green Party's presidential candidate would be invalid.

125.    The state of New York has no legitimate interest in the invalidation of otherwise valid nominating petition signatures collected by a petition circulator/witness who signs a nominating petition for another nominating petition for the same office.

126.    At most, the proper remedy for a petition circulator/witness signing a nominating petition for another candidate for the same office is to merely invalidate the signature of the petition circulator–not the signatures of innocent voters who properly signed Plaintiff Team Kennedy's nominating petition and did nothing in violation of New York law.

127.     Any registered voter may file general objections to a nominating petition within three days after the last day to file nominating petitions.

128.     After filing general objections, specific objections to signatures, or to any other alleged defect of the nominating petition, must be filed within six days after the filing of the general objection.

129.     Section 6-154 of the New York Election Law invites and establishes a process allowing private-party challenges to the validity of petition signatures.

130.     The private challenge process requires Plaintiff Team Kennedy to pay for the validation of its own petition signatures.

131.     Upon a challenge to Plaintiff Team Kennedy nominating petitions, Plaintiff Team Kennedy is required to spend funds for: (1) fees, costs, travel and accommodation for legal counsel; (2) travel and accommodation of witnesses, including any and all of Plaintiff Team Kennedy's petition circulators who will be subpoenaed with the hope by its political adversaries that a large number of such petition circulators will fail to comply thereby invalidating all petition signatures collected by any such petition circulator; (3) compensable time for handwriting experts and other witnesses; (4) hearing preparation; (5) staff; (6) process servers' fees and expenses; (7) photocopies; (8) meals; (9) legal research; and (10) conference call expenses.

132.     The imposition of costs on a candidate to secure ballot access, specifically, the cost of validating ballot access petition signatures has been held unconstitutional as a severe burden to rights guaranteed under the First and Fourteenth Amendments to the U.S. Constitution.

133.     In *Constitution Party of Pennsylvania v. Aichele*, the United States District Court for the Eastern District of Pennsylvania and the United States Court of Appeals for the Third Circuit held Pennsylvania's less burdensome petition requirements followed by the costs of a

private petition challenge process was unconstitutional under the First and Fourteenth Amendments to the U.S. Constitution and forced the Commonwealth of Pennsylvania to choose between the statutory formula which, in 2012, required independent presidential candidates to collect 20,601 valid petition signatures or the private challenge process used by the Commonwealth to validate petition signatures.

134.    Prior to 2019, New York required independent presidential candidates to collect only 15,000 nominating petition signatures to secure ballot access.

135.    NYSBOE Defendants must be required to accept either the reduced 15,000 valid nominating petition signatures for independent presidential candidate ballot access or forego the private challenge system to validate nominating petition signatures in favor of in-house validation by the NYSBOE staff.

136.    The combination of the increased 45,000 valid signatures now required for ballot access for independent presidential candidates and the private challenge process to validate petition signatures imposes a far more severe burden on core political speech protected under the First and Fourteenth Amendments to the U.S. Constitution than the facts confronted by the district court and Third Circuit in *Constitution Party of Pennsylvania v. Aichele*.

137.    Complying with all the above-described conditions and requirements in the condensed timeframe between April 16 and May 28, 2024—the six-week period for signature collection and petition filing permitted by New York—Plaintiff Team Kennedy collected over 100,000 petition signatures seeking to place Mr. Kennedy on the ballot.

138.    Plaintiff Team Kennedy paid expenses of over $1,000,000 to do so.

139. Nationwide, at an expense of over $12,000,000, Plaintiff Team Kennedy has collected more than 1,000,000 signatures for Mr. Kennedy to secure ballot access across the country.

140. On May 21, anticipating various petition challenges, this action was originally filed by Plaintiff Team Kennedy, asserting that the various, onerous New York petition regulations described above are unconstitutional.

141. Nevertheless, on May 28, 2024, Team Kennedy properly submitted over 100,000 Kennedy petition signatures to the NYSBOE.

142. Plaintiffs have no adequate remedy at law.

<u>**COUNT I – Freedom of Speech and Right to Vote**</u>
(42 U.S.C. § 1983: First & Fourteenth Amendments to the U.S. Constitution)

143. Plaintiffs reassert each preceding allegation as if set forth fully herein.

144. The Residence Requirement that an independent presidential candidate list on his ballot-access petitions his "fixed" "permanent" "home" address is severely burdensome and discriminatory and therefore subject to strict scrutiny under the First and Fourteenth Amendments.

145. The Residence Requirement is severely burdensome because it: (A) imposes risk and danger on the candidate by publicizing his home address; (B) forces a candidate with more than one home to guess at and gamble on which of those homes, if any, will later be determined by a New York court to be the candidate's "place of residence" under New York law, at which time it will be too late under New York law to correct the error and collect new petitions; (C) conflicts with the requirements of other states' petitioning laws; and (D) excludes candidates who have no fixed home address.

146.     It is discriminatory because it applies to independent candidates but not to candidates nominated by recognized parties, who are not required to petition for ballot access and are not required to declare or even submit to New York officials their home address.

147.     The Residence Requirement cannot survive strict scrutiny because the state interests it allegedly serves are not compelling and it is not narrowly tailored to achieve them.

148.     A majority of the States—twenty-eight—do not require presidential candidates to publish either a domicile or residential address on ballot access petitions.  Of those, twenty-four states do not require any address to be recorded on their presidential ballot access petitions.[9] Two states—New Hampshire and Maine—require presidential candidates to publish the address on their ballot access petition at which they are registered to vote.  And two states—Louisiana and Oklahoma—do not require presidential candidates to circulate any petitions to qualify for the general election ballot.

149.     If it is not subject to strict scrutiny, the Residence Requirement is still subject to and cannot satisfy *Anderson* scrutiny, because it serves no legitimate state interests whatsoever.

150.     Accordingly, the Residence Requirement violates Plaintiffs', Mr. Kennedy's and voters' rights under the First and Fourteenth Amendments.

## COUNT II – Qualifications Clause
(42 U.S.C. § 1983:  Violation of the Presidential Qualifications Clause)

151.     Plaintiffs reassert each preceding allegation as if set forth fully herein.

---

[9] Those states are: Alabama, Alaska, Arizona, Arkansas, Delaware, Florida, Hawaii, Idaho, Iowa, Kentucky, Massachusetts, Mississippi, Montana, Nevada, New Jersey, New Mexico, North Carolina, Oregon, Rhode Island, South Carolina, South Dakota, Utah, Virginia, and Washington.

152. The Presidential Qualifications Clause establishes three—and only three—qualifications for eligibility to serve as President of the United States: (1) an age requirement; (2) native-born citizenship; and (3) 14 years of U.S. residency.

153. States have no power to add to those qualifications.

154. As applied to presidential candidates, the Residence Requirement operates to impose two additional qualifications on eligibility to serve as President.

155. First, the Residence Requirement bars individuals who have no permanent home address that meets that requirement from running for President.

156. Second, it bars individuals who have a home address but choose not to disclose it from running for President.

157. On both grounds, the Residence Requirement violates the Presidential Qualifications Clause.

### COUNT III – Per Signature Compensation Ban
(42 U.S.C. § 1983: First and Fourteenth Amendments to the U.S. Constitution)

158. Plaintiffs reassert all previous allegations as if fully set forth herein.

159. The other above-described burdensome, arbitrary, and unjustified requirements imposed by New York on ballot access petitioning also violate, individually and collectively, the First and Fourteenth Amendments.

160. New York's Valid Per-Signature Compensation Ban requires an independent candidate to provide full compensation for the time petition circulators engage in petition fraud.

161. The criminal sanctions imposed under Section 17-122(4) of the New York Election Law dramatically and severely increase the costs of collecting nominating petition signatures.

162. The criminal sanctions imposed under Section 17-122(4) of the New York Election Law required Plaintiff Team Kennedy to provide full compensation to petition circulators aligned

with political opponents who engaged in petition fraud rendering their nominating petition signatures of no value.

163.    The Valid Per-Signature Compensation Ban fails to advance any legitimate state interest because it requires compensation to be paid to petition circulators who engage in petition fraud.

164.    The Valid Per-Signature Compensation Ban reduces the scope of the constitutional right to compensate professional petition circulators, in the most efficient manner possible, under the First and Fourteenth Amendments to the U.S. Constitution.

### COUNT IV – Circulator Restriction and Early Elector Selection
(42 U.S.C. § 1983:  First and Fourteenth Amendments to the U.S. Constitution)

165.    Plaintiffs reassert all previous allegations as if fully set forth herein.

166.    The other above-described burdensome, arbitrary, and unjustified requirements imposed by New York on ballot access petitioning also violate, individually and collectively, the First and Fourteenth Amendments.

167.    New York's requirement that independent presidential candidates seeking access to the ballot must collect 45,000 valid petition signatures and file them with NYSBOE Defendants within a short six-week window is unnecessarily burdensome and designed not just to keep frivolous candidates off the general election ballot, but to keep any independent presidential candidate off New York's general election ballot.

168.    In addition to the cost of securing 45,000 valid signatures, Plaintiff Team Kennedy is also required to bear the substantial costs of defending its nominating petition signatures through a private challenge system which has, in tandem with a high signature collection requirement, been held unconstitutional under the First and Fourteenth Amendments to the U.S. Constitution in Pennsylvania by federal courts.

169.     Collecting enough signatures to survive a challenge by private voters under New York's excessively restrictive ballot access rules cost Plaintiff Team Kennedy over $1.1 million.

170.     The cost of defending and validating nominating petition signatures was even more—over $2.9 million dollars.

171.     In tandem, Sections 6-142 and 6-154 operate to impose a severe burden on rights guaranteed to Plaintiffs and the voters of New York under the First and Fourteenth Amendments to the U.S. Constitution for which Plaintiffs respectfully request the relief detailed in this action.

172.     Section 6-140(1)(b) invalidates any signature collected by a petition circulator/witness if that petition circulator/witness signs a nominating petition for another candidate for the same office.

173.     No state interest is advanced by invaliding otherwise valid signatures by voters who have done nothing wrong and want to record their support for ballot access for the candidate of their choice.

174.     New York lacks any interest in disenfranchising New York voters to sign a ballot access petition, which is core political speech afforded the highest level of protection under the First and Fourteenth Amendments to the U.S. Constitution, based on the conduct of some third-party who merely offered them a clipboard with a petition to sign.

175.     The only operative signatures on a nominating petition to secure ballot access are the signatures of the registered voters signing a nominating petition to support ballot access for a candidate.

176.     To the extent New York has any interest in preventing a petition circulator/witness from signing a nominating petition for another candidate of the same office, the penalty should be limited to the invalidation of the petition circulator/witness's signature from the nominating

petition for another candidate–not the invalidation of hundreds of otherwise valid and constitutionally protected signatures of innocent registered voters.

177.    Section 6-140(1)(b) invites political opponents to hire Plaintiff Team Kennedy's petition circulators and instruct them to sign a nominating petition for another candidate of the same office and thereby sabotage the ballot access efforts of a political opponent.

178.    Accordingly, Section 6-140(1)(b) is a severe burden on core political speech protected under the First and Fourteenth Amendments.

179.    In addition, NYSBOE Defendants require Plaintiff Team Kennedy and independent presidential candidates to name their slate of presidential electors in April/May of a presidential election year when they only require presidential nominees for the major political parties to name their slate of presidential electors after the conclusion of the national nominating convention on or about August of a presidential election year.

180.    The shorter time period to interview, vet, select and name presidential electors on an independent presidential candidate's nominating petition imposes an additional fail point to invalidate a ballot access petition upon a late discovery that a named presidential elector does not meet the requirements to hold the position of presidential elector–a threat not imposed against the presidential candidates of the major political parties.

181.    Accordingly, NYSBOE Defendants' requirement for independent presidential candidates to name their presidential electors on their nominating petitions as a condition precedent to secure ballot access violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution for which Plaintiffs respectfully request the relief detailed in this action.

### COUNT V –City/Town Petition Requirement
(42 U.S.C. § 1983:  First and Fourteenth Amendments to the U.S. Constitution)

182.    Plaintiffs reassert all previous allegations as if fully set forth herein.

183. The other above-described burdensome, arbitrary, and unjustified requirements imposed by New York on ballot access petitioning also violate, individually and collectively, the First and Fourteenth Amendments.

184. New York's requirement that independent presidential candidates seeking access to the ballot must collect 45,000 valid petition signatures and file them with NYSBOE Defendants within a short six-week window is unnecessarily burdensome and designed not just to keep frivolous candidates off the general election ballot, but to keep any independent presidential candidate off New York's general election ballot.

185. NYSBOE Defendants lack any interest in invalidating a petition signature which can be identified as that of a registered voter of New York just because the voter records their village rather than their city or town.

186. The New York voter file contains numerous registrations whose address is indicated by the village where the voter resides rather than their city or town.

187. Because the New York voter file does not conform with NYSBOE Defendants' ballot access rule that voters must record their city or town (or county in the City of New York), it is impossible for independent candidates to validate in advance such voters' signatures, causing independent candidates to have to collect many more thousands of additional signatures on nominating petitions than otherwise required.

188. Further, the failure of the New York voter file to record only the city or town of registered voters makes it impossible for an independent candidate to correct a voter's recordation of a village to the correct city or town as required by NYSBOE Defendants.

189.	The fact that the New York voter file includes village designations rather than exclusively city and town designations, demonstrates that Section 6-130 fails to advance any legitimate state interest sufficient to save the requirement from constitutional scrutiny.

190.	The inability of an independent candidate to either validate and/or correct signature lines because the New York voter file does not conform to ballot access rules, is a severe burden on rights guaranteed to Plaintiffs under the First and Fourteenth Amendments to the U.S. Constitution for which Plaintiffs respectfully request the relief detailed in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.	Enter immediate emergency injunctive and permanent relief ordering that Mr. Kennedy's name be kept on the New York general election ballot;

2.	Declare that the Residence Requirement under Section 6-140 of the New York Election Law is unconstitutional as applied to Mr. Kennedy;

3.	Declare that Section 6-140(1)(b) of the New York Election Law is unenforceable to the extent it invalidates any petition signature on a nominating petition made after the date the signature of that sheet's petition circulator/witness was made on a nominating or designating petition for a different candidate for the same office as on Plaintiff Team Kennedy's nominating petition.

4.	Declare that New York must validate the signatures on nominating petitions when the signer's village, and not their city or town, is indicated on the signature line.

5.	Declare that New York may not henceforth enforce the requirement that independent presidential candidates collect 45,000 valid signatures on nominating petitions to secure ballot access, but may enforce the previous requirement to collect 15,000 valid signatures.

6.     Enter permanent injunctive relief enjoining NYSBOE Defendants from enforcing Section 6-140(1)(b) of the New York Election Law to the extent it invalidates any petition signature made on a nominating petition after the date of the signature of that sheet's petition circulator/witness on a nominating or designating petition for a different candidate for the same office as Plaintiff Team Kennedy's nominating petition.

7.     Enter permanent injunctive relief enjoining NYSBOE Defendants from enforcing Section 6-130 of the New York Election Law prohibiting otherwise identifiable registered voters of New York from recording their village instead of their city or town.

8.     Permanently enjoin NYSBOE Defendants from enforcing the requirement for independent presidential candidates to name their slate of presidential electors before presidential candidates of the major political parties do during a presidential election year.

9.     Permanently enjoin Defendant James from enforcing criminal sanctions for violation of the Valid Per-Signature Compensation Ban imposed under Section 17-122(4) of the New York Election Law.

10.     Award such other and further relief as the Court deems proper and just.

11.     Award Plaintiffs reasonable attorney fees and costs associated with the prosecution of this action pursuant to 42 U.S.C. § 1988.

Dated:  August 22, 2024

Respectfully submitted,

**/s/ Gary Donovan**                  **/s/ Paul Rossi**

Gary L. Donovan, Esq.

Law Office of Gary L. Donovan

565 Plandome Road #209

Manhasset, NY  11030

516.312.8782

gdonoyan@verizon.net

*Counsel for Team Kennedy*

Paul A. Rossi, Esq.

(*pro hac vice* forthcoming)

316 Hill Street Suite 1020

Mountville, PA  17554

717.961.8978

Paul-Rossi@comcast.net

*Counsel for Team Kennedy*

**/s/ Jim Walden**                     **/s/ Jed Rubenfeld**

Jim Walden, Esq.

Walden, Macht, Haran & Williams

250 Vesey Street

New York, New York

212-335-2031

jwalden@wmhwlaw.com

*Counsel for Team Kennedy*

Jed Rubenfeld, Esq.

1031 Forest Rd.

New Haven CT 06515

203-432-7631

jed.rubenfeld@yale.edu

*Counsel for AV2024, Jeffrey Rose*